**STATE of Delaware**

v.

**Meredith TARBUTTON, Defendant.**

Superior Court of Delaware,
New Castle County.

Submitted Aug. 27, 1979.

Decided Oct. 5, 1979.

---

Norman A. Barron, Deputy Atty. Gen., Dept. of Justice, Wilmington, for State.

John A. Clark, III, Asst. Public Defender, Wilmington, for defendant.

Richard A. Paul, Wilmington, for amicus curiae.

O'HARA, Judge.

Upon motion of the State a hearing was held June 14, 1979, to determine if the defendant, Meredith Tarbutton, should be released from the Delaware State Hospital pursuant to 11 Del.C. § 403(b). The precise issue to be decided is whether, based on the expert testimony presented and the record in this case, this Court "is satisfied that the public safety will not be endangered by (the defendant's) release." [1]

The pertinent facts in this case are as follows:

In 1974, the defendant was indicted on one count each of murder and possession of a deadly weapon during the commission of a felony stemming from the slaying of a seven year old boy in August, 1974. The defendant was also charged in the same indictment with multiple kidnapping, sexual misconduct and sodomy offenses, the majority of which were unrelated to the August slaying and involved young boys other than the homicide victim. The defendant successfully moved to have the murder and deadly weapon counts severed from the remainder of the indictment and, thereafter, entered a plea of not guilty by reason of insanity as to these two offenses.

By stipulation of defense and prosecution counsel, and with the Court's approval, the matter was tried without a jury on the sole issue of mental illness. The Court heard extensive expert testimony from Phillip G. Mechanick, M. D., a psychiatrist appearing on behalf of the defendant, and from T. Richard Huxtable, Jr., M. D., a psychiatrist appearing on behalf of the State. The experts agreed that the defendant was legally insane, as defined in 11 Del.C. § 401(a),[2] at the time of the homicide. Consequently, the Court entered a verdict of not guilty by reason of insanity. The State then made a motion for the defendant to be committed to the Delaware State Hospital and, pursuant to § 403(a), the Court ordered the defendant committed "until the Superior Court . . . is satisfied that the public safety will not be endangered by his release." Since the entry of this order the defendant has been confined to the State Hospital.

Following entry of the Court's verdict and order on the murder and deadly weapon charges, a plea agreement was negotiated by defense and prosecution counsel concerning the remaining charges. Both counsel agreed that although there was ample psychiatric evidence to support the mental illness defense to the murder and weapon charges, there was no such evidence available to support such a defense to these remaining charges involving acts occurring over an extended period of time prior to the murder/weapon incident. The defendant

---

1. 11 Del.C. § 403 provides:
   (a) Upon the rendition of a verdict of "not guilty by reason of insanity," the court shall, upon motion of the Attorney General, order that the person so acquitted shall forthwith be committed to the Delaware State Hospital.
   (b) A person committed to the Delaware State Hospital in accordance with subsection (a) shall be kept there until the Superior Court of the county wherein the case was tried is satisfied that the public safety will not be endangered by his release. The Superior Court shall without special motion reconsider the necessity of continued detention of a person thus committed after he has been detained for 1 year. It shall thereafter reconsider his detention upon motion on his behalf or whenever advised by the State Hospital

that the public safety will not be endangered by his release.

2. 11 Del.C. § 401 provides:
   (a) In any prosecution for an offense, it is an affirmative defense that, at the time of the conduct charged, as a result of mental illness or mental defect, the accused lacked substantial capacity to appreciate the wrongfulness of his conduct or lacked sufficient willpower to choose whether he would do the act or refrain from doing it.
   (b) If the defendant prevails in establishing the affirmative defense provided in subsection (a) of this section, the trier of facts shall return a verdict of "not guilty by reason of insanity."

entered a guilty plea to three counts of sexual misconduct and was sentenced to seven years imprisonment. The defendant also entered a guilty plea to two counts of sodomy and was sentenced to thirty years imprisonment. These sentences were to run concurrently, with the defendant to receive credit on such sentences for time spent as a Court mandated inmate of the State Hospital. All other charges were dropped by the State. Shortly after entry of these sentences, the defendant filed a motion for reduction of sentence which this Court denied on December 16, 1975.

In April, 1977, the State filed a § 403(b) motion for a hearing to determine whether the defendant should then be released from the State Hospital and turned over to the Department of Corrections to serve out the remainder of his thirty year prison term. A hearing was held in August, 1977, at which Drs. Huxtable and Robert W. Buckley (a psychiatrist who was then and continues to be Medical Director at the State Hospital) gave their shared opinion that the defendant no longer presented a danger to society because of the mental illness existing at the time of the homicide. However, Dr. Mechanick testified that the defendant continued to have aberrant sexual fantasies concerning young boys and that the public safety would be endangered by his release. The Court, troubled by the lack of agreement among the psychiatric experts as to the state of the defendant's progress, declined to order his release from the State Hospital at that time.

In June, 1978, the State again moved for a § 403(b) hearing. However, although a hearing was initially scheduled, none was held in 1978 when the State requested an indefinite continuance.

Most recently the State moved for a § 403(b) hearing in April, 1979, with Drs. Mechanick and Buckley testifying. This time the psychiatric experts substantially agreed that although the defendant no longer suffers from the acute psychosis which led to his initial commitment, he continues to suffer from a related personality disorder. Dr. Mechanick described this dis-

order as homosexual pedophilia, and indicated that in stressful situations the defendant might not be able to control his impulses stemming from this disorder. Consequently, neither expert was willing to state that the defendant would not present a danger to the public safety if released.

With this latest evidence, and the entire record before it, the Court must now determine whether the § 403(b) standard for release of a criminal insanity acquittee has been satisfied in this case. While certainly not dispositive of the Court's duty under § 403(b), it is interesting to note that neither the State's counsel nor defense counsel advocate the defendant's present release from the State Hospital, in spite of the fact that the latest hearing was triggered by the State's motion for the 403(b) hearing.

## I.

The literal terms of § 403(b) require that "[a] person committed to the Delaware State Hospital [upon the rendition of a verdict of 'not guilty by reason of insanity'] shall be kept there until the Superior Court . . . is satisfied that the public safety will not be endangered by his release." Amicus curiae has raised two preliminary questions regarding application of this standard to this particular defendant which the Court must address before reaching its ultimate decision.

## A.

The first question involves interpretation of the words "public safety" in § 403(b). Because of his sentences on the sodomy and sexual misconduct offenses, the defendant would not be freed from custody if released from the State Hospital at the present time. Rather, he would immediately be confined to a Department of Corrections facility to serve out the remainder of his prison sentences. In this context, the question is whether "public safety" should be read in reference to the general public or to the inmate population of the particular correctional facility to which the defendant will be confined upon release from the State Hospital.

The term "public safety" is not explicitly defined in the Delaware Criminal Code. Therefore, in construing that term, the Court is required to give it "its commonly accepted meaning." 11 Del.C. § 221(c). Black's Law Dictionary 1393 (rev. 4th ed. 1968) defines "public" as:

"Pertaining to a state, nation or whole community; . . . relating to, or affecting the whole body of people or an entire community; . . . not limited or restricted to any particular class of the community." (Citations omitted).

By this definition, "public safety" must be read as referring to the safety of the general public or the Delaware community-at-large. The Court believes this is an appropriate construction of § 403(b), since the provision is generally applicable to all insanity acquittees, including those who will be confined further in a correctional facility upon their release from the State Hospital. Moreover, since Tarbutton will eventually become eligible to make application for parole after serving sufficient time on his thirty year sentences, his confinement in a correctional facility, upon release from the State Hospital, may only temporarily delay his ultimate release into the general community. Lastly, the Court notes that there is nothing on the face of § 403 or any related statutory provision that reveals a legislative intention to treat insanity acquittees who may be required to serve prison time upon release from the State Hospital differently from any other type of insanity acquittee. For all these reasons, the Court construes "public safety" in § 403(b) to refer to the safety of the general population in this State.

The second question raised by amicus is whether the decision in *Mills v. State*, Del.Supr., 256 A.2d 752 (1969), has special impact on the case at bar. In *Mills*, the Supreme Court noted that the insanity acquittee release provision there considered[3] referred to danger to the public safety without express reference to the mental illness for which the acquittee was initially committed to the State Hospital. 256 A.2d at 757, n. 4. The Court then construed the provision by supplying the missing reference to the insanity acquittee's mental illness "for the reason that dangerousness without mental illness could not be a valid basis for indeterminate confinement in the State Hospital." *Id.* This Court believes that the same construction must be placed upon the danger to public safety referred to in § 403(b). The danger must arise from factors directly related to the mental illness for which the insanity acquittee was initially confined, since the whole basis for his continuing confinement is the legal presumption "that mental illness which a defendant has alleged and proven by a preponderance of the evidence to have existed at the time he performed the criminal acts, continues until such time as the presumption is satisfactorily rebutted." *In Matter of Dio W. Lewis,* Del.Supr., 403 A.2d 1115 (1979).

The Court does not believe that this construction of § 403(b) presents any problem in the case at bar. The concerns for the public safety expressed by the psychiatric experts at the most recent § 403(b) hearing arise from the fact that the defendant continues to suffer from homosexual pedophilia and might not be able to control impulses stemming therefrom in a stress situation. Homosexual pedophilia is a personality disorder that is directly related to the acute psychosis which caused Tarbutton to commit the homicide and which caused this Court to enter the verdict of acquittal by reason of insanity. Therefore, the danger to public safety, if any, presented by Tarbutton's release at this time is directly related to the mental illness for which he was initially committed.

## B.

Having disposed of the preliminary matters, the Court is now prepared to ad-

---

**3.** Although the *Mills* case involved § 403(b)'s predecessor provision, for the purpose of the "dangerousness" issue in this case the Court finds our present code provision to be substan-

tially equivalent to that considered in *Mills*. See *In Matter of Dio W. Lewis,* Del.Supr., 403 A.2d 1115 (1979).

dress the primary issue in this case, i. e., whether the defendant should be released from the State Hospital at this time. The answer depends on whether this Court "is satisfied that the public safety will not be endangered by his release." The Supreme Court has recently construed this § 403(b) standard "to mean 'that such person is (not) likely to commit . . . serious harm to . . . others or to property . . .'" *In Matter of Dio W. Lewis,* supra, (citations omitted).

This question poses no great difficulty in Tarbutton's case at present, given the expert testimony elicited at the June 14, 1979 hearing. So long as the defendant's personality disorder continues, and he remains susceptible to uncontrollable impulses stemming therefrom in stress situations, this Court cannot be satisfied that he is not likely to commit serious harm to others if released from the State Hospital. Therefore, the Court declines to order the defendant's release from the State Hospital at this time.

## II.

Because the Court has fully resolved the legal issues necessary for disposition of the case at bar, it is reluctant to embark upon consideration of any other matters which are not ripe for resolution at this time. However, a question was raised by the expert witnesses at the June 14 hearing concerning their potential civil liability to third persons arising from professional judgments made and opinions expressed in the context of § 403(b) release proceedings. The Court is aware that such fears may inhibit psychiatric experts and cause them to be excessively cautious in rendering opinions to the Court at § 403(b) hearings. Therefore, the Court believes that a brief consideration of the problem raised by the psychiatric experts is appropriate at this time.

The necessity for expert psychiatric testimony in most § 403(b) release hearings was obvious to the drafters of the Delaware Criminal Code. See Commentary on § 403. Psychiatrists' opinions will normally form a substantial basis for the ultimate finding that an insanity acquittee's release will or will not endanger the public safety. As viewed by at least some psychiatrists in this State, § 403(b) literally requires the Court to be absolutely sure that the insanity acquittee's release *will not endanger* the public safety. These psychiatrists fear that if they express an opinion in the § 403(b) context favoring release of an insanity acquittee, and the Court acts upon this recommendation, they (the psychiatrists) may later be held civilly liable as guarantors of the released person's safe conduct. Thus, if the released person subsequently causes harm to others, the psychiatrists fear they will be held liable in tort to those harmed by the released person's conduct.

In recent years the notion that a psychiatrist may be held civilly liable by third persons for the torts of his patient has gained acceptance in some American common law jurisdictions. E. g., *Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976). There are no reported decisions in this State, however, recognizing this type of liability or the existence of a duty owed by an examining psychiatrist to specific third persons or to the general public. Therefore, it is quite possible that the Delaware courts, when squarely presented with this question in a concrete case, will refuse to hold a psychiatrist liable for torts committed by his patient. Furthermore, assuming our courts do recognize some kind of psychiatrist liability in such cases, it is by no means certain that this liability would necessarily extend to a case arising in the § 403(b) context, where the psychiatrist's primary function may be to examine a person in order to assist the Court in making the requisite statutory determination. Even assuming our courts do recognize the doctrine of psychiatrist liability to third persons in the context of a § 403(b) release, it is unlikely, in the extreme, that psychiatrists would be held absolutely liable for errors in professional judgment in such matters. At most our courts would probably adopt a negligence standard. In that

event, the psychiatrist will simply be required to exercise reasonable care and skill, as measured by locally prevailing professional standards, in rendering his opinion. Thus, a psychiatrist's reasonable but erroneous judgment concerning a § 403(b) insanity acquittee's potential for harm to persons in the community would not give rise to civil liability. The Court has been unable to find any reported decisions in this country where a psychiatrist has been held to a standard stricter than negligence in releasing an institutionalized mental patient. See generally, Annot., 38 A.L.R.3d 699 (1971).

Finally, the Court believes that the construction placed on § 403(b) in *Lewis* should alleviate some of the fears expressed by the experts in this case. The absolute standard that appears on the face of the statute (i. e., "public safety *will not be* endangered by his release") has been modified to the more realistic assessment " 'that such person *is (not) likely* to commit . . . serious harm to . . . others or to property . . . .' " *In Matter of Dio W. Lewis,* supra, (emphasis added). This interpretation of § 403(b) is consistent with this Court's expressed belief that psychiatrists participating in such cases will be held to no higher standard than reasonable care in forming their professional opinions.

### III.

In conclusion, for the reasons expressed in Part I of this opinion, the Court declines to order the defendant's release from the Delaware State Hospital at the present time.